UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Renaissance North, LLC,          :    Case No. 1:09-cv-474
                                 :
      Plaintiff,                 :
                                 :
vs.                              :
                                 :
Fifth Third Bank,                :
                                 :
      Defendant.                 :

**ORDER**

Before the Court is Defendant Fifth Third Bank's motion for
summary judgment. (Doc. 37) Plaintiff Renaissance North has
filed an opposition (Doc. 47), and Fifth Third has replied.
(Doc. 51) Also ripe for decision is Fifth Third's motion in
limine to exclude testimony from Plaintiff's expert witness (Doc.
41), which is fully briefed. For the following reasons, the
Court will grant Defendant's motion.

**FACTUAL BACKGROUND**

Renaissance North, LLC ("Renaissance") is an Ohio limited
liability company. Its members are Glenn Shepherd, Timothy
Eldredge, and Dave Kingen. Renaissance was formed to develop and
build a local retirement and assisted living community. Eldredge
and Kingen are also affiliated with Keystone Senior, LLC, an
entity with experience in developing and managing several other
successful senior living communities. Renaissance needed
financing for the project, and Bill Carroll acted as its loan

-1-

broker. Carroll obtained a financing proposal from Fifth Third Bank through Jeff Gardner, a Fifth Third Vice President who negotiated with Renaissance throughout the relevant time period. Renaissance accepted the proposal. (Shepherd Dep. Exh. 27)

On February 11, 2008, Fifth Third sent Renaissance a "Summary Commitment Letter" which outlined the general terms and conditions for the loan (which the document and the parties also describe as a "credit facility"). (Shepherd Dep. Exh. 30) The offered terms included a loan amount "up to" $20,200,000, with stated loan-to-value limits and a commitment/facility term of 60 months. Anticipated sources of other project funds, loan interest rates, required security, and a specification of anticipated fees and costs are all set forth in the letter. There is no dispute that the letter included a number of express "Conditions Precedent to Closing." One of those conditions which is important to this controversy states: "Commitment of at least Two Million Five Hundred Thousand ($2,500,000) in Mezzanine Debt under terms Acceptable to the Bank."[1] The conditions also include requirements for completion of legal due diligence; that the loan amount will not exceed 75% loan-to-MAI appraised value;

---

[1] Neither party has defined the term "mezzanine debt" or "mezzanine financing." Fifth Third describes the phrase to mean a requirement that the borrower obtain additional funds to bridge the gap between the total cost of the project, and the amount Fifth Third was permitted to loan based on that projected total cost. (Doc. 37 at 3, n.2)

and that the loan will fully comply with applicable federal regulations.  With regard to the "form and substance of documentation" for the loan, the letter states that its terms are "... not exhaustive and the Bank may require additional terms, covenants and provisions after further consideration of the transaction.  All documentation shall be in form and substance satisfactory to the Bank and its counsel...".  The letter required Renaissance to accept the offer by February 18, which it did.  The letter did not identify an anticipated closing date nor provide an expiration date in the event the loan did not close.

Jeff Gardner sent an email to Shepherd and Carroll on February 12 and attached a proposed closing schedule for the loan.  That schedule listed March 14 as the expected closing date, and Gardner asked Renaissance to confirm that the schedule's timelines were reasonable.  (Shepherd Exh. 32) Shepherd testified that at the time he signed the loan contract, Renaissance did not have a firm commitment from any mezzanine financing lender.  He said that potential sources had been identified, and Renaissance had been discussing a proposal with GE Credit Union prior to accepting Fifth Third's offer.  An email from Carroll to Shepherd on February 11 confirms this, as Carroll states that the "next big hurdle is the Mezz and I am hopeful that GE Credit Union will do the deal now that 5/3rd has confirmed".  (Shepherd Exh. 30)

But by March 12 the discussions with GE proved unsuccessful, and the President of the Credit Union informed Carroll that Renaissance should look elsewhere for financing. (Shepherd Exh. 37) The Fifth Third loan did not close on the originally scheduled date of March 14. Both Shepherd and Carroll testified that the reasons that GE declined to provide financing had nothing to do with Fifth Third. Shepherd also testified that he was not sure the loan would have closed on that date in any event, as there were other project tasks that had not been completed. (Shepherd Dep. at 178-179)

Renaissance continued its search for mezzanine lenders, and on May 22, 2008 it obtained a "term sheet" from PRN Capital Trust ("PRN"), which outlined proposed terms and conditions for a possible loan. The term sheet was not a firm commitment, as it identified several conditions and prerequisites to any lending commitment. (McGee Affidavit, Exhibit G to Doc. 37) Renaissance signed the PRN term sheet and sent it to Gardner the next day, May 23. Gardner testified that when he received the PRN term sheet, he decided to seek internal approval to extend the term of the bank's loan offer, by extending the bank's "blue memo" approval. Gardner described a "blue memo" as the bank's "internal approval document. It outlines the summary structure of the deal. It provides objective evidence about the success or failure of whatever deal we're looking at. It includes financial

statements, financial information generally." (Gardner Dep. at 21)  Steven Abbey, Gardner's superior at Fifth Third, testified that the bank must have an approved blue memo prior to entering into credit agreements with borrowers.  Abbey said that approved blue memos have a validity for at most 90 days.  (Abbey Dep. at 32)  There is no evidence that Renaissance was actually aware of this internal policy in February 2008 when it initially accepted Fifth Third's commitment terms.  But there is no dispute that both Carroll and Shepherd were informed of this requirement by June 2008.  Shepherd testified that he learned from Carroll that Gardner was seeking internal approval for an extension. (Shepherd Dep. at 191)  Carroll testified that Gardner told him about this issue, but that Gardner did not explain what was involved in obtaining the blue memo extension.  (Carroll Dep. at 111-112)

Shepherd sent an email on June 23 to Carroll, Eldredge, Kingen and Scott Berry, telling them all: "We need to do everything and anything to get this loan closed as soon as humanly possible before Fifth Third shuts down commercial lending and our commitment goes away.  Please lets do whatever it takes to see if we can not get this closed in the next few days [sic]." (Shepherd Exh. 41)  Gardner then emailed Carroll on July 2, telling him "just got word that our internal approval was reaffirmed for another 90 days (through September 2008).  Any

updates on PRN?" (Shepherd Exh. 40) Carroll responded to
Gardner that PRN "is supposed to go to ny tomorrow or monday."
(Id.) Carroll testified that he did not express any concern in
writing to Gardner about the need to renew the blue memo, but
that he told Gardner on the phone that "whatever you guys have
to do internally it has nothing to do with the piece of paper
that's been issued; you know, we have an open-ended commitment
from you. He said, that is correct. And he said, this is just
an internal formality. So there was no reason for me to ...
acknowledge this email. I said I thought it was nonsense." (Id.
at 112-113)

PRN Capital Trust did not issue a firm commitment for
funding, and ultimately declined to provide financing for
Renaissance. Steve McGee, PRN's Executive Vice President and
Senior Lender, states in his affidavit that several of the
prerequisites expressly set forth in the term sheet had not been
satisfied. McGee also avers that PRN's decision was unrelated to
any action or inaction by Fifth Third, to any requirements
imposed by the bank, or to any delays caused by the bank. (Doc.
37, Exhibit G)

In July 2008, lacking a firm commitment for mezzanine
financing, Shepherd purchased the land on which the project was
intended to be built for $880,000. Carroll testified that
Shepherd was forced to complete the purchase due to a deadline

imposed by a GE-affiliated entity that had some control or ownership interest in the property. (Carroll Dep. at 121) The decision to purchase the land was not made because of any requirement imposed by Fifth Third, or any assurance from Fifth Third about reimbursing Renaissance for costs incurred to complete the purchase. (Shepherd Dep. at 194-196)

On September 29, 2008, one day before the expiration of the first extension of the bank's blue memo, Gregel Realty Associates in Cincinnati gave Renaissance a non-binding letter of intent proposing secondary financing for the project. Carroll testified that on September 22, he sent an email to Gregel stating that Fifth Third had "reaffirmed commitment," referring to the 90-day extension Gardner obtained on July 2. (Carroll Dep. at 123) Gregel's proposal stated that the loan closing would occur as soon as feasible after key documents were executed, but in no event later than October 31, 2008. Gregel also reserved a contingency period until October 31, 2008 to determine if Gregel could raise the necessary funds from its investor group. The letter plainly stated that at any time on or before that date, Gregel would be entitled, in its sole and absolute discretion, to withdraw the proposal with no penalty. (Doc. 39, Exhibit G, Meyer Affidavit with attached Exhibit A)

Carroll sent Gregel's letter to Gardner, who responded by email on September 30 telling Carroll that he would have to get

an "updated internal extension in order to proceed." (Shepherd Exh. 43) On October 13, Gregel informed Renaissance that it had "two investors from our group pull out, leaving us well short of our goal. This, together with the need to do Mezzanine financing, has caused us to reconsider our participation and to pull out." (Shepherd Exh. 44) Eliot Meyer, the Managing Member of Gregel Realty Associates, submitted an affidavit stating that several of the proposal's prerequisites were never satisfied, including legal documents to be prepared by Renaissance, execution of an operating agreement for Gregel, and Gregel's need to raise $2,500,000 from its investor group. Meyer avers that Gregel's withdrawal was unrelated to Fifth Third, or to any requirements of or any delays attributed to Fifth Third. (Doc. 37, Exhibit I)

Carroll asserts in his testimony that Renaissance was ready and able to close the Fifth Third loan on September 29, the date he sent the Gregel proposal to Gardner. He claims that Gregel's letter of intent, along with certain key closing documents which were being exchanged among the parties at that time, were all that was needed for closing. But Fifth Third's counsel was not available late on September 29 and on September 30 due to the Jewish holy days. Carroll (and other Renaissance witnesses) suggest that Fifth Third used this as an excuse to delay the loan closing beyond the bank's internal September 30 deadline. The

evidence in the record does not support Carroll's assertion. On September 30, Renaissance's attorney Andy Graf sent Carroll an email asking Carroll to see if he could get an extension from Gardner until at least October 31, if not November 30. (Carroll Dep. 132 and Exh. 36) Graf's email also stated that there were "so many parts of the deal that are not finalized and we will be relying on others beyond our control to respond."[2] Carroll also sent an email on October 1 to Kingen and Eldredge (at Keystone) listing five items still needed for the closing. (Carroll Dep. at 133) Carroll asserts that these were just minor items that would not take much time to complete, but he did not dispute the fact that the items listed were not completed at the time he sent the email. Moreover, Gregel's Meyer states in his affidavit that Gregel was not ready to close the offered loan by September 30, as the prerequisites set forth in its proposal had not been satisfied.

Despite the lapse of Fifth Third's 90-day credit approval extension, the parties continued to work on loan package documents after October 1. A number of emails and documents were exchanged between Renaissance, Gregel, and Fifth Third's attorneys (Goldberg Kohn) in the first ten days of October. Carroll admitted that he was frustrated with Renaissance's

---

[2] This email exhibit is not included in the record, but Carroll admitted that Graf made these statements.

attorney because Carroll felt he was taking too long in commenting on the Gregel operating agreement (which Renaissance was required to approve and execute according to the terms of Gregel's offer).  Gardner testified that he needed to get the bank's approval for a new "blue memo" credit approval.  To that end, Gardner received an email from a bank credit analyst on October 7, listing items that were needed for an updated credit analysis for Renaissance North, which Gardner assumes was part of the 90-day extension review.  (Gardner Dep. at 127)  Gardner was informed around this time that Fifth Third's credit department also required an updated appraisal on the property, and he told Carroll about that request.  The appraiser who performed the original appraisal in early 2008 had been dropped from the bank's approved list, which required the appointment of a new appraiser. Gardner's October 15 email to Carroll said the bank had released a bid for the appraisal.  (Gardner Exh. Q)  Fifth Third assigned the appraisal on October 21, and Renaissance continued to pursue other potential mezzanine lenders.

On November 25, 2008, Argosy Real Estate submitted a financing proposal to Renaissance, stating that its terms were "presented for conceptual purposes only and in no way represent a commitment on the part of Argosy".  (Doc. 37, Exh. I; Winn Aff. Exh. A)  Renaissance accepted the proposal the next day, and Carroll informed Gardner about this new potential lender.  The

new appraisal had been completed in mid-November and sent to Fifth Third for internal review and acceptance. When Renaissance was informed of the new appraised value, it objected to some of the data used by the appraiser and to the opinion on project value, which Renaissance thought was unjustifiably low. This led to further discussions between the bank and Renaissance, and the appraisal was apparently finalized sometime in January 2009. Carroll asserts that if the appraisal and the bank's review of it had been completed sooner than that, Argosy would likely have moved more quickly to finalize its commitment. (Carroll Dep. at 181)

Meanwhile, in December 2008, Shepherd sent Gardner two alternate budget proposals for financing the project, one which reduced the original $2.5 million of mezzanine debt, and the second which eliminated all mezzanine financing. (Shepherd Exh. 52) Carroll testified that Renaissance was exploring ways to reduce the project's cost and possibly eliminate the need for mezzanine financing, including the possibility of the partners contributing more equity to the project. Fifth Third did not accept or commit to either of these proposals.

The credit department was considering the loan in January. Gardner's internal memorandum of January 13, 2009, which summarized the history of the project, concluded:

> Given the deterioration in housing markets
> and the overall economy since September 2008,

> it is uncertain whether this credit request
> will get approved.  Instead of telling the
> Borrower that the credit request is denied,
> it would be helpful to possibly benchmark the
> credit request to the success of Renaissance
> West, a very similar project located in
> western Cincinnati.  One approach would be to
> seek credit approval again once Renaissance
> West achieves a certain occupancy level. It
> is scheduled to take move-ins beginning in
> April/May 2009.  This method would provide
> some evidence of the likelihood of success
> with Renaissance North and might be
> acceptable to the Borrower.

(Doc. 47, Exh. D)  On January 14, Gardner told Carroll during a telephone call that the final appraised value of the property was lower than the original, and that Gardner expected the best outcome at that point would be a tentative approval and delayed closing, premised upon Renaissance's progress in filling Renaissance West.  Carroll sent an email the same day to Shepherd, Kingen and Eldredge, conveying this information and stating that he told Gardner that Renaissance would demand that Fifth Third honor its commitment letter, or Renaissance would likely find a new lender.  (Carroll Exh. 55)

Renaissance alleges that on February 5, 2009, Gardner called Carroll and told him that the bank had approved revised loan terms, and told him a new commitment letter would be issued during the week of February 9.  Gardner denies making any such promise, but for purposes of its motion Fifth Third does not dispute the allegation.  Carroll could not recall if these revised terms included a requirement of mezzanine financing.

(Carroll Dep. at 208)  On February 19, Shepherd sent an email to
Gardner, telling Gardner that he had "answered my prayers.
Cannot thank you enough for getting our commitment approved as
requested".  Gardner responded that "we still need the final
signature before your prayers are answered, but I am hopeful we
will get that today or tomorrow."  The "final signature" meant
the bank's credit approval on the blue memo.  (Gardner Dep. at
146-147)

     On February 25, 2009, Argosy formally withdrew its funding
proposal, and refunded Renaissance's deposit.  Argosy's letter
states that "it has become extremely difficult to fund
investments in this increasingly slowing and uncertain economy.
As a result, we have reevaluated our investment criteria and have
decided not to pursue this investment at this time.  This
decision is a policy decision for Argosy Real Estate rather than
an evaluation of you and of Keystone."  (Carroll Exh. 60)
Carroll testified that he believes Argosy withdrew because of
Fifth Third's delays in finalizing the second appraisal and in
securing the "blue memo" approval.  Argosy's letter refutes that
assertion, as does the affidavit of Argosy's principal Andrew
Winn submitted with Fifth Third's motion.  Winn avers that the
reason Argosy declined to fund the project was unrelated to any
action or inaction by Fifth Third, and was not due to any
requirements imposed or delays caused by the bank.  (Doc. 37,

-13-

Exh. K)  Renaissance obtained another affidavit from Andrew Winn,

filed in response to Fifth Third's motion.  In this affidavit,

Winn generally confirms the facts discussed above, and notes that

by the end of January 2009, Argosy had not received notice of a

final commitment from Fifth Third, and that Argosy had not

completed its own due diligence.  Despite Argosy's February 25

letter formally declining to fund Renaissance, Winn states that

on March 20, Carroll sent him some basic Fifth Third commitment

numbers, and that Argosy again declined to proceed.  Winn states

that he wrote to Carroll on March 24:

> After reviewing the Renaissance North project
> again..., we have decided to pass on the
> opportunity.  As I'm sure you are aware, it
> has become extremely difficult to fund
> investments in this increasingly slowing and
> uncertain economy.  In such times, using
> history as an example, we are keenly aware
> that opportunities will present themselves
> which will yield terrific returns.  I have no
> doubt that serious wealth will be made by
> those with equity to invest and who are
> willing to take well calculated risks.
> However the economy and investing environment
> has changed considerably since we first
> looked at this opportunity.  At this time, we
> are very hesitant to pursue ground up
> development activity, especially in the
> residential arena or in situations such as
> this where there is a strong dependence on
> people selling their houses to live in such a
> facility as Renaissance North.

(Doc. 49, Winn Aff. at ¶11)  Winn also states in this affidavit

that Argosy's withdrawal was not due to any failure of

Renaissance North to meet the prerequisites contained in Argosy's

term sheet.  (Id. at ¶12)

On March 10, almost a month after Gardner's alleged oral promise of a loan, Carroll emailed Shepherd about his conversation with Gardner and described the specific terms that Gardner provided.  The record is unclear whether or not Carroll shared this information in writing with anyone else before March 10.  Shepherd testified that after he received the email, he prepared a written funding request based on the terms related by Carroll and sent it to Gardner on March 11.  (Shepherd Dep. at 240-244, Exh. 54)  Shepherd did not speak with Gardner directly about these terms, and received all of his information from Carroll.  Shepherd's proposal sought a revised loan amount of $19,584,000, combined with $800,000 in leasehold equity and $3,004,583 in allocated sponsors' equity, for a revised total project cost of $23,388,583.

Gardner testified that he asked Carroll to have Renaissance provide a written funding request because up to that point, he had been receiving and reviewing several "hypothetical emails ... where either Bill [Carroll] or Glenn [Shepherd] would just think of different ideas.  And instead of going off of emails we wanted to have a formal funding request."  (Gardner Dep. at 151-152)

On March 13, 2009, Tim Eldredge spoke with Steve Abbey, who told Eldredge that the bank was going to turn down the Renaissance proposal.  When Shepherd learned this, he sent an

email on March 16 to Gardner, insisting that Fifth Third honor its commitment and close the loan before the end of March. If the bank failed to do so, Shepherd said that he would disclose to the press and to "every governmental department that has anything to do with banking" his allegations about Fifth Third's conduct. (Shepherd Exh. 55) This prompted a written response the next day from Gardner, rejecting both the various Renaissance proposals for restructured financing and Shepherd's accusations against the bank. Gardner's letter also confirmed that Fifth Third was prepared to close the financing in accordance with the February 11, 2008 loan commitment but with a higher interest rate, a lowered loan amount, liability releases from Renaissance and Shepherd, and a closing no later than April 19, 2009. (Shepherd Exh. 56) Renaissance submitted several more alternate proposals after Gardner's letter, including an alternate financing plan on March 28, 2009, another funding request on April 23, and a verbal proposal on April 24, all of which the bank treated as counterproposals to Gardner's March 17 letter. Fifth Third declined to accept any of these counterproposals, and informed Renaissance on May 1 that it considered the matter closed to further consideration. (Shepherd Exh. 58) Despite that letter, Shepherd submitted another funding request on May 8, requesting a loan of $18,734,000 in accordance with unspecified "terms and conditions" that Shepherd stated had been discussed at a March 30

meeting with the bank. (Shepherd Exh. 61) Gardner responded on May 22, stating that Renaissance failed to satisfy the terms of the March 17 funding offer, and that nothing since then had changed the bank's position. Gardner again told Shepherd that the bank considered the matter closed. (Shepherd Exh. 62)[3]

Renaissance filed its complaint in this Court on July 9, 2009, alleging in Count 1 that Fifth Third breached its obligations under the February 11, 2008 commitment letter. Count 2 asserts a promissory estoppel claim, alleging that Fifth Third promised to loan money to Renaissance under the terms set forth in the written Commitment Letter, and that Renaissance detrimentally relied upon that promise. Renaissance seeks specific performance, compensatory and punitive damages.

**ANALYSIS**

Summary Judgment Standards

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion of a undisputed fact must be supported by citations to particular parts of the record, including

_____

[3] Gardner's May 22 letter also refers to a May 19 letter from Shepherd which is not in the record. Gardner's statements suggest that letter may have threatened Fifth Third with litigation, as Gardner asserts that "Fifth Third believes it has no legal liability to you or Renaissance and intends to vigorously defend itself". (Shepherd Exh. 62)

depositions, affidavits, admissions, and interrogatory answers. The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) (internal quotation omitted).

The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. <u>Guarino v. Brookfield Township Trs.</u>, 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. <u>Anderson</u>, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Electric Industries Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. <u>United States v. Diebold Inc.</u>, 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. The

court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250.  "If the evidence is merely colorable, ...  or is not significantly probative, ... the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

Breach of Contract

Fifth Third's motion contends that Renaissance failed to satisfy the express conditions precedent set forth in the February 11, 2008 loan commitment.  For that reason, Fifth Third was not obligated to loan money to Renaissance, and the breach of contract claim fails on the merits.

Ohio law requires an agreement to lend money to be in writing, and the terms of any such agreement "shall be determined solely from the written loan agreement, and shall not be varied by any oral agreements that are made or discussions that occur before or contemporaneously with the execution of the loan agreement.  Any prior oral agreements between the parties are superseded by the loan agreement."  Ohio Rev. Code 1335.02(C).

There is no dispute that the February 11, 2008 commitment letter lacked an express final expiration date.  However, Fifth Third retained the right to "require additional terms, covenants and provisions after further consideration of the transaction.

-19-

All documentation shall be in form and substance satisfactory to the Bank and its counsel, Goldberg Kohn." The originally anticipated March 14, 2008 closing did not occur after GE decided not to fund the project, and Renaissance concedes that Gardner told them in May or June that he needed to secure a credit approval extension. Gardner's July 2 email confirmed Fifth Third's agreement to extend its credit commitment until September 30. (Shepherd Exh. 40)[4] Shepherd and Carroll both testified they did not understand why the bank needed this "extension" when the original letter lacked an expiration date. Carroll repeatedly referred to the extension as some "little internal matter" that did not involve Renaissance. But neither of them denied that Renaissance had been informed of this bank requirement, and Renaissance did not formally object to this requirement.

There is also no genuine dispute that Renaissance failed to satisfy the condition of obtaining a firm commitment for mezzanine funding. Carroll insists that the Gregel offer of September 29 was a "firm commitment" and that Gregel was "ready to go," such that the Fifth Third loan could have closed on September 30 but for Fifth Third's own delay and the

_____

[4] This oral modification of the loan commitment would not be barred by the statute of frauds, which forbids prior or contemporaneous oral agreements from varying written terms, but does not prohibit subsequent modifications to those terms.

-20-

unavailability of its lawyers. There is no evidence in the record that supports Carroll's belief, and as noted above the facts lead to the opposite conclusion. Meyers states in his affidavit that Gregel's September 29 term sheet was not a binding commitment, and the proposal plainly states that it is nonbinding. Renaissance's own lawyer told Carroll to try to get another extension from Fifth Third so that Renaissance could attempt to satisfy Gregel's terms. (Carroll Exh. 41) Carroll clearly blames Fifth Third, but the evidence does not support a reasonable inference that if Fifth Third's lawyers had been available on September 29 and 30 that a closing would have been feasible and would have taken place. Renaissance has not come forward with facts establishing that all of Gregel's funding preconditions would have been satisfied by that date.

Renaissance also contends that Fifth Third could not arbitrarily impose a termination date, and Carroll and Shepherd repeatedly point out that the original commitment letter did not include such a date. Ohio law generally holds that when a contract does not specify a particular time of performance, the legal effect is that it is to be performed within a reasonable time. See, e.g., <u>United States Construction Corp. v. Harbor Bay Estates, Ltd.</u>, 172 Ohio App.3d 609, 616 (Ohio App. 2007). Here, Fifth Third expressly reserved its right to impose reasonable additional terms and conditions "after further consideration of

the transaction."  In view of this language, it would be commercially unreasonable for Renaissance to insist or expect that Fifth Third's offered terms and conditions would remain fixed and unchanged on an open-ended basis, without regard to possible changes in the borrower's financial status or the viability of the proposed project in view of overall market conditions.

In any event, it is also clear that after September 30, Fifth Third did not terminate its offer but continued to discuss the loan with Renaissance and to renew its "blue memo" credit approval.  Renaissance accuses Fifth Third of "dragging its feet" and asserts that by the fall of 2008, Fifth Third had actually decided not to loan the money for the project but concealed that decision from Renaissance.  Instead of revoking the offer, the bank insisted on an updated appraisal for the property, and then took too long to finalize its acceptance of the appraised value. Renaissance contends that Fifth Third resubmitted the loan package to its underwriting department for reapproval, which in Renaissance's view was unnecessary and simply another way to avoid the commitment.  Renaissance insists that "it is likely" that the loss of mezzanine funding from Gregel and Argosy was caused by these delays.  Again, this contention ignores the affidavits from those lenders who clearly state that nothing Fifth Third did or failed to do resulted in their decision not to

provide funding.  Carroll's belief to the contrary is not a sufficient basis upon which Renaissance can avoid summary judgment.  The evidence is undisputed that Renaissance was never able to satisfy the condition precedent of obtaining firm mezzanine financing.

In opposing Fifth Third's motion on this claim, Renaissance admits that contracting parties have the right to enforce contract terms, but argues that Fifth Third breached the implied duty of good faith and fair dealing.  (Doc. 47 at 11-12) Renaissance accuses Fifth Third of falsely assuring Renaissance that the loan would be available when by the summer or fall of 2008 the bank had changed its mind.  Renaissance claims that the bank's actions after September 2008 (obtaining new credit approvals, the new appraisal, and underwriting review) all were done to thwart Renaissance's desire to close the loan.  Ohio law imposes on all contracting parties an implied duty of good faith. Ed Schory & Sons, Inc. v. Francis, 75 Ohio St.3d 433, 662 N.E.2d 1074 (Ohio 1996).  But this implied duty does not create an independent basis for a separate tort action.  Roth v. National City Bank, 2010 Ohio 5812, ¶18 (Ohio App. 2010); Wendy's International, Inc. v. Saverin, 337 Fed. Appx. 471, 476-77 (6th Cir. July 9, 2009) (unpublished), citing Thomasville Furniture Indus., Inc. v. JGR Inc., 3 Fed. Appx. 467, 472 (6th Cir. 2001). Nor does the implied duty forbid a contracting party from

insisting on enforcement of the contract's terms, even when enforcement may work a hardship on the other party or amounts to "hard-nosed conduct." Forsythe v. Bancboston Mortgage Corp., 135 F.3d 1069, 1076 (6th Cir. 1997)(applying Kentucky law and finding bank did not breach its implied duty when it instituted foreclosure proceedings after accepting partial payments for a period of time). As the Ohio Supreme Court observed, "[f]irms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.'" Ed Schory & Sons, 75 Ohio St.3d at 443, quoting Kham & Nates Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1357-58 (7th Cir. 1990). Fifth Third's credit approval extension, its request for an updated appraisal and review by underwriting, given the many months that had passed since the February 2008 commitment letter had been issued, were all reasonable actions permitted within the scope of the bank's right to "require additional terms, covenants and provisions" for the loan. Fifth Third did not breach its implied duty of good faith by exercising its right to do so.

The only other written loan offer made to Renaissance was Fifth Third's March 17, 2009 letter. There is no dispute that Renaissance did not satisfy the terms set forth in that offer, and Carroll testified that Renaissance would never have accepted

that offer in any event.  Gardner's alleged promise in February 2009 that the bank would loan money is not enforceable under the statute of frauds.  Ohio Rev. Code 1335.02(A)(3) broadly defines a "loan agreement" as a promise pursuant to which a financial institution loans "or agrees to loan" money, or "otherwise extends credit or makes a financial accommodation."  Gardner's alleged promise that a commitment letter would be forthcoming was never confirmed in a writing signed by the bank, and would not be enforceable for that reason.

Furthermore, Renaissance is not entitled to a decree of specific performance of the commitment letter.  Fifth Third is not obligated to perform when Renaissance has failed to establish its own ability to perform the conditions precedent to that loan.

Renaissance has not come forward with evidence establishing a genuine factual dispute on the merits of its breach of contract claim.  The affidavits from all of the potential mezzanine lenders are unrefuted, that their decisions not to finance Renaissance North were not related to or caused by Fifth Third's conduct or inaction.

<u>Promissory Estoppel</u>

The equitable doctrine of promissory estoppel may apply when (1) a clear and unambiguous promise was made; (2) the person to whom the promise was made relied upon it; (3) that reliance was reasonable and foreseeable; and (4) the party seeking to enforce

-25-

the promise is injured because of its reasonable reliance.
Stonecreek Props. v. Ravenna Sav. Bank, 2004 Ohio 3679 (Ohio App.
2004) (internal citations omitted).

Renaissance alleges in its complaint that Fifth Third
promised in its February 11, 2008 letter to fund the loan, and
repeats that assertion in opposing Fifth Third's motion.
Renaissance's estoppel claim based on the terms of the letter is
precluded by that written contract.  As this Court has observed,
"promissory estoppel is not a doctrine designed to give a party
to a negotiated commercial bargain a second bite at the apple in
the event it fails to prove breach of contract."  Kena
Properties, LLC v. Merchants Bank & Trust, 2006 U.S. Dist. LEXIS
22901 at *12 (S.D. Oh., April 24, 2006) (internal citation
omitted), aff'd, 218 Fed. Appx. 402, 406 (6th Cir., February 20,
2007).

Renaissance devotes the bulk of its response brief to this
claim, accusing Fifth Third of "dragging its feet" while assuring
Renaissance that it intended to fund the loan, leading
Renaissance to justifiably rely on the original promise.  Even if
the original commitment letter could form the basis for an
estoppel claim, Renaissance must demonstrate that any reliance on
the promised loan was reasonable and justified.  There is no
dispute that Fifth Third's promise was conditioned on the
requirement that Renaissance secure a firm commitment for

mezzanine financing.  Any reliance professed by Renaissance upon some open ended promise of a loan would not be reasonable unless and until Renaissance satisfied the conditions precedent to the performance of that promise.  Renaissance again argues that Fifth Third's delays and actions caused Renaissance to lose financing from both Gregel and Argosy, but the representatives from both lenders have averred that was not the case.

Gardner's alleged February 2009 oral promise that the bank would make the loan on different terms than those contained in the February 2008 letter is not enforceable, and cannot give rise to an estoppel.  In order to invoke the equitable doctrine, Renaissance must establish that the promise was both clear and unambiguous.  The alleged promise, that a loan would be made on terms to be announced in a written commitment letter to be issued sometime in the future, is not a clear and unambiguous promise upon which a sophisticated business party such as Renaissance could reasonably and justifiably rely.  Moreover, Carroll admitted that he knew Gardner lacked authority to bind the bank to any other loan terms, and he testified that Renaissance would not act on the alleged promise until it actually received Fifth Third's written commitment.  (Carroll Dep. at 209) Renaissance has not shown that it reasonably relied on any promises made by Fifth Third, other than those set forth in the February 2008 commitment letter.  And for the reasons discussed, that letter

cannot support an equitable estoppel remedy.

**CONCLUSION**

For all of the foregoing reasons, Defendant's motion for summary judgment (Doc. 37) is granted.  Plaintiff's complaint is dismissed with prejudice.  Defendant's motion in limine to exclude Plaintiff's expert (Doc. 41) is denied as moot.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: October 12, 2011    <u>s/Sandra S. Beckwith</u>
                           Sandra S. Beckwith
                           Senior United States District Judge